# UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

**VERONICA ELPHAGE, ET AL.**                    **CIVIL ACTION**

**VERSUS**                                                     **NO.  10-358-SDD-RLB**

**SID J. GAUTREAUX, IN  HIS**
**CAPACITY AS SHERIFF OF EAST**
**BATON ROUGE PARISH, ET AL.**

## NOTICE

       Please take notice that the attached Magistrate Judge's Report has been filed with the Clerk of the United States District Court.

       In accordance with 28 U.S.C. § 636(b)(1), you have fourteen (14) days after being served with the attached Report to file written objections to the proposed findings of fact, conclusions of law and recommendations therein.  Failure to file written objections to the proposed findings, conclusions, and recommendations within 14 days after being served will bar you, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions of the Magistrate Judge which have been accepted by the District Court.

       **ABSOLUTELY  NO  EXTENSION  OF  TIME  SHALL  BE  GRANTED  TO  FILE WRITTEN OBJECTIONS TO THE MAGISTRATE JUDGE'S REPORT.**

       Signed in Baton Rouge, Louisiana, on August 9, 2013.

                   **RICHARD L. BOURGEOIS, JR.**
                   **UNITED STATES MAGISTRATE JUDGE**

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

VERONICA ELPHAGE, ET AL.                          CIVIL ACTION

VERSUS                                            NO.  10-358-SDD-RLB

SID J. GAUTREAUX, IN HIS
CAPACITY AS SHERIFF OF EAST
BATON ROUGE PARISH, ET AL.

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

This matter is before the court on a referral from the district court of the defendants' Motion for Summary Judgment.[1]  The motion is opposed.[2]  The defendants' motion seeks dismissal of all of the plaintiffs' claims, which include claims brought under 42 U.S.C. §§ 1983, 1985, and 1986, and the Fourth, Fifth, and Fourteenth Amendments of the United States Constitution, as well as various state tort claims.

### Background

The following facts are uncontested unless otherwise noted.  On the night of May 10, 2009, East Baton Rouge Sheriff's Office deputies responded to a dispatch concerning the firing of firearms on or near Skysail Avenue in Baton Rouge.  Deputy George O'Connor, Jr. of the East Baton Rouge Sheriff's Office Canine Division initially responded to assist in crowd control at the Skysail location.  After a few minutes, another deputy reported to him that two suspects were potentially fleeing the area and were seen on Helm Drive, which is in close proximity to Skysail.

---

[1] R. Doc. 16.
[2] R. Doc. 22.

1

The events forming the basis of this suit unfolded at Helm Drive. At least two of the plaintiffs — Cardell White, Sr. and Veronica Elphage — were attending a Mother's Day party on Helm Drive. After the party, Mr. White was helping move items from the party to Ms. Elphage's home. As he was walking back to the house on Helm Drive where the party was located, Mr. White and another suspect, Christopher Kelly,[3] were detained by deputies who had arrived at the location. Deputy James Gehling[4] placed Mr. White in handcuffs and put him in the back of a police vehicle.

While the deputies were detaining Mr. White and Mr. Kelly, a group of 15-20 people gathered at Helm Drive. Deputy O'Connor arrived with his canine and formed a barrier between the crowd and the deputies detaining the two suspects. The deputies warned the crowd that they would use pepper spray if they did not "get back." Deputy Brian Farrell[5] administered a one-second burst of chemical control spray in a "Z" pattern and sprayed the crowd. Deputy O'Connor testified in his deposition that he did not deploy his spray and did not witness any other deputy spray the crowd. The plaintiffs contest this testimony and contend that other deputies sprayed the crowd. The plaintiffs, however, do not specifically identify Deputy O'Connor as one of the additional deputies who allegedly used pepper spray.

Ms. Elphage also arrived at the scene on Helm Drive while Mr. White and Mr. Kelly were being detained. According to the defendants, Ms. Elphage was "screaming and yelling" at the deputies and "refused to relent" when Deputy O'Connor told her to get back. The plaintiffs dispute the defendants' characterization of Ms. Elphage's behavior. Ms. Elphage was placed under arrest by Deputy O'Connor and Deputy Gehling for public intimidation, resisting arrest by force, and simple assault.

---

[3] Mr. Kelly is not named as a plaintiff.
[4] Deputy Gehling is not named as a defendant.
[5] Deputy Farrell is not named as a defendant.

Neither Ms. Elphage nor Mr. White was sprayed with pepper spray. The parties agree, however, that Ms. Elphage felt a minor burning sensation on her legs and chest for approximately fifteen minutes. The only damages suffered by Mr. White were minor scrapes and a temporary "ring" around his wrists from the handcuffs used to detain him. He did not feel any of the effects from the pepper spray. Furthermore, Deputy Farrell testified at his deposition that the deputies called EMS to the scene after the use of pepper spray, EMS examined the people in the crowd, and EMS stated that no baby was sprayed and no person was experiencing breathing problems. The plaintiffs contest this testimony on the ground that it was provided by Deputy Farrell and not EMS, but the plaintiffs do not reference any testimony from other witnesses contradicting Deputy Farrell's statements.

The plaintiffs also claim that Ms. Elphage captured the events that made the basis of this litigation on film but her camera was confiscated during her arrest and returned to her without the memory card.[6]

On May 10, 2010, the plaintiffs brought an action in state court alleging causes of action including civil rights violations and state law tort claims against Sheriff Sid J. Gautreaux, in his official capacity as Sheriff of East Baton Rouge Parish, Deputy O'Connor, both individually and in his official capacity, and several unnamed John Doe deputies in both their individual and official capacities.[7] The John Doe deputies have been dismissed from the suit without prejudice.[8] There are nine plaintiffs of majority who have brought claims individually and on the behalf of ten minors. The federal claims alleged by plaintiffs are violations of "42 U.S.C. §§ 1983, 1985, and 1986, as well as the Fourth, Fifth and/or Fourteenth Amendments to the United

---

[6] R. Doc. 22-3, at 6.
[7] R. Doc. 1-4 ("Petition").
[8] R. Doc. 12. The plaintiffs have not named any additional deputies as defendants.

States Constitution."[9]  The state law claims alleged by the plaintiffs include violations of "Louisiana Civil Code Articles 2315, 2315.6 and 2316, through the commission of negligence, assault, battery, and the negligent and intentional infliction of emotional distress, and defamation."[10]  Rather than address their causes of actions through counts, the plaintiffs provide generalized lists of allegedly "negligent, intentional, and otherwise culpable acts" by the defendants.[11]  The plaintiffs seek to recover, among other things, compensatory damages, punitive damages, and attorney's fees.  The defendants timely removed this action based on federal question jurisdiction.[12]

The plaintiffs allege in the petition that the charges brought against Ms. Elphage "were never accepted or pursued by the District Attorney."[13]  The plaintiffs do not now dispute, however, that after they filed their action Ms. Elphage was prosecuted by the District Attorney, entered into a pretrial diversion program, and the charges against Ms. Elphage were dismissed only upon her completion of the pretrial diversion program.[14]  On or about March 28, 2011, the District Attorney filed  a Bill of Information filed in the Nineteenth Judicial District Court for the Parish of East Baton Rouge, Louisiana, documenting that Ms. Elphage was charged with resisting an officer (La. R.S. § 14:108) and simple assault (La. R.S. § 14:38).[15]  On May 12, 2011, this action was ordered stayed pending the conclusion of the criminal proceedings against Ms. Elphage.[16]  The Plaintiffs then filed an unopposed motion to lift the stay,[17] attaching an extract of criminal court minutes stating that Ms. Elphage had "completed PTI" on September

---

[9] Petition, ¶ 17.
[10] Petition, ¶ 18.
[11] Petition, ¶¶ 19-20.
[12] R. Doc. 1.
[13] Petition, ¶ 13.
[14] R. Doc. 16-1, at 19.
[15] R. Doc. 9-3.
[16] R. Doc. 10.
[17] R. Doc. 11.

26, 2011.[18]  The court takes judicial notice that "PTI" is an acronym for the pretrial intervention program of the Office of the District Attorney for the Nineteenth Judicial District, Parish of East Baton Rouge, Louisiana.  On October 19, 2011, the court ordered the stay lifted.[19]

## Summary of the Parties' Arguments

The defendants advance several arguments in support of their position that the plaintiffs' claims should be dismissed.  First, the defendants argue that both Sheriff Gautreaux and Deputy O'Connor are protected from claims brought against them based on qualified immunity.  The defendants claim that Sheriff Gautreaux is entitled to qualified immunity if a reasonable person could have believed the deputies at issue were sufficiently trained and supervised in light of clearly established law and the information he possessed.  With regard to Deputy O'Connor, the defendants claim that he is entitled to qualified immunity if a reasonable person could have believed that he acted reasonably in light of clearly established law and the information he possessed.  Second, the defendants argue that the claims brought against Sheriff Gautreaux and Deputy O'Connor in their official capacities must be treated like claims for municipal liability. These claims must fail, the defendants argue, because the plaintiffs do not identify an official policy or custom in the East Baton Rouge Sheriff's Office that caused the deprivation of any of the plaintiffs' constitutional rights.  Third, the defendants argue that Sheriff Gautreaux is not subject to supervisory liability for the acts of his deputies because the plaintiffs have not provided sufficient evidence regarding the Sheriff's failure to train or his deliberate indifference to the plaintiff's constitutional rights.  Finally, the defendants address the individual causes of action raised by the plaintiffs, including both allegations of constitutional violations and state law liability.  In addressing Ms. Elphage's claim for false arrest, the Defendants argue that she is

---

[18] R. Doc. 11-2.
[19] R. Doc. 12.

barred from bringing a Section 1983 action under *Heck v. Humphrey*, 512 U.S. 477 (1994), because her agreement to participate in the pretrial intervention program (termed a "pretrial diversion program" by the defendants) constituted a conviction of her charges and success on her Section 1983 action would undermine the validity of that conviction.

In response, the plaintiffs argue that the defendants' motion should be denied because there are several genuine issues of material fact. The plaintiffs contend that multiple deputies sprayed them with pepper spray, not just Deputy Farrell. The plaintiffs admit, however, that they have been unable to identify other deputies who allegedly deployed pepper spray. The plaintiffs imply that such information would have been located on the memory card in Ms. Elphage's camera that was allegedly taken by the arresting deputies. Furthermore, the plaintiffs argue that there are factual disputes regarding Ms. Elphage's conduct leading to her arrest and the conduct of the crowd leading up to the use of pepper spray. The plaintiffs do not address the defendants' legal arguments with regard to qualified immunity, municipal liability, the sufficiency of the alleged underlying constitutional violations forming the basis of the plaintiffs' Section 1983 claims, or the application of *Heck* to Ms. Elphage's claims.

## Applicable Law & Analysis

### I.    Summary Judgment Standard

Summary judgment is appropriate where "there is no genuine dispute as to any material fact" and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A party moving for summary judgment must inform the court of the basis for the motion and identify those portions of the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, that show that there is no such genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); Fed. R. Civ. P. 56(c). If the moving

party carries its burden of proof under Rule 56, the opposing party must direct the court's attention to specific evidence in the record which demonstrates that the non-moving party can satisfy a reasonable jury that it is entitled to a verdict in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). This burden is not satisfied by some metaphysical doubt as to alleged material facts, by unsworn and unsubstantiated assertions, by conclusory allegations, or by a mere scintilla of evidence. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). Rather, Rule 56 mandates that summary judgment be entered against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 323. Summary judgment is appropriate in any case where the evidence is so weak or tenuous on essential facts that the evidence could not support a judgment in favor of the non-moving party. *Little*, 37 F.3d at 1075. In resolving a motion for summary judgment, the court must review the facts and inferences in the light most favorable to the non-moving party, and the court may not evaluate the credibility of witnesses, weigh the evidence, or resolve factual disputes. *International Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263 (5th Cir.1994).

## II.  Claims brought under 42 U.S.C. § 1983

"Section 1983 imposes liability on anyone who, under color of state law, deprives a person 'of any rights, privileges, or immunities secured by the Constitution and laws.'" *Blessing v. Freestone*, 520 U.S. 329, 340 (1997). Section 1983 "is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred." *Graham v. Connor*, 490 U.S. 386, 393-94 (1989). "The purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." *Wyatt v. Cole*, 504 U.S. 158, 161 (1992).

To state a claim under § 1983 a plaintiff must (1) allege a violation of a right secured by the Constitution or laws of the United States and (2) demonstrate that the alleged deprivation was committed by a person acting under color of state law. *Victoria W. v. Larpenter,* 369 F.3d 475, 482 (5th Cir. 2004). A plaintiff "must identify defendants who were either personally involved in the constitutional violation or whose acts are causally connected to the constitutional violation alleged." *Woods v. Edwards*, 51 F.3d 577, 583 (5th Cir. 1995).

The generalized allegations of the petition make it difficult for the court to determine the exact constitutional violations raised in support of the plaintiffs' § 1983 claims and which plaintiffs are raising those discreet violations. Having reviewed the pleadings and other submissions by the parties, the court concludes that the underlying constitutional violations allegedly giving rise to the plaintiffs' Section 1983 claims include false arrest, detention, or imprisonment, and excessive force (or unreasonable seizure). The court will first analyze these claims brought against Deputy O'Connor in his individual capacity before turning to the allegations brought against Deputy O'Connor and Sheriff Gautreaux in their official capacities.

The court will analyze the claims brought by Veronica Elphage and Cardell White, Sr. separate from the claims of the remaining plaintiffs as they are the only two plaintiffs who appear to allege that they were confined or otherwise restrained against their wills as a result of the acts of the deputies. *See Bryan v. Jones*, 530 F.2d 1210, 1213 (5th Cir. 1976) ("The elements of the prima facie case [of false imprisonment] are: (1) intent to confine, (2) acts resulting in confinement, and (3) consciousness of the victim of confinement or resulting harm."); *Kyle v. City of New Orleans*, 353 So. 2d 969, 971 (La. 1977) ("False arrest and imprisonment occur when one arrests and restrains another against his will without a warrant or other statutory authority.").

### A.  Section 1983 Claims Against Deputy O'Connor in His Individual Capacity

#### i.  Qualified Immunity Standard

The plaintiffs assert § 1983 claims against Deputy O'Connor in his individual capacity and he has responded with the affirmative defense of qualified immunity.[20]  The qualified immunity defense protects government officials "from liability for civil damages insofar as their conduct does not violate 'clearly established' statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  The qualified immunity defense entitles a defendant to avoid the "burdens of litigation" as well as liability.  *Manis v. Lawson*, 585 F.3d 839, 843 (5th Cir. 2009) (quoting *Mirchell v. Forsyth*, 472 U.S. 511, 530 (1985)).

"A qualified immunity defense alters the usual summary judgment burden of proof." *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010).  The analysis has two prongs.  "Once an official pleads the defense, the burden then shifts to the plaintiff, who must rebut the defense by establishing a genuine fact issue as to whether the official's allegedly wrongful conduct violated clearly established law."  *Id.*  In order to carry this burden, the plaintiffs must establish (1) that the defendants committed a constitutional violation under current law and (2) that the defendants' actions were objectively unreasonable in light of the law that was clearly established at the time of the alleged misconduct.  *Club Retro, LLC v. Hilton*, 568 F.3d 181, 194 (5th Cir. 2009).  The court may conduct this two-pronged qualified immunity inquiry in any sequence. *Manis*, 585 F.3d at 843 (citing *Pearson v. Callahan*, 555 U.S. 223 (2009)).  "The touchstone of this inquiry is whether a reasonable person would have believed that his conduct conformed to

---

[20] Petition, ¶ 2.b-c.  Although Sheriff Gautreaux raises the defense of qualified immunity, that defense is unavailable to him because the plaintiffs' claims are brought against him only in his official capacity.  Qualified immunity is not available when an official is sued in his official capacity.  *See Harvey v. Blake*, 913 F.2d 226 (5th Cir. 1990) (holding city official's liability for back pay was in her official capacity, so doctrine of qualified immunity did not apply).

the constitutional standard in light of the information available to him and the clearly established law." *Goodson v. Corpus Christi*, 202 F.3d 730, 736 (5th Cir. 2000).  Thus, "[e]ven law enforcement officials who 'reasonably but mistakenly [commit a constitutional violation]' are entitled to immunity." *Id.* (quoting *Hunter v. Bryant*, 502 U.S. 224, 227 (1991)).

### ii.  False Detention of Cardell White, Sr.

The court turns first to Mr. White's claim of false detention.  The plaintiffs do not allege that Mr. White was arrested; instead, they allege that he "was placed into a police car in handcuffs, but was eventually released without an arrest after it was realized that a mistake(s) had been made."[21]  His claim, therefore, will be analyzed through the Fourth Amendment standards for unlawful detention as opposed to unlawful arrest.  *See United States v. Campbell*, 178 F.3d 345, 349 (5th Cir. 1999) ("[D]rawn guns and handcuffs do not necessarily convert a detention into an arrest.").

A temporary investigative stop of an individual is constitutionally allowed if it is based on reasonable suspicion of criminal activity.  *Terry v. Ohio*, 392 U.S. 1 (1968).  An officer's reasonable suspicion of criminal activity asserted to justify a *Terry* stop must be grounded on a "particularized and objective basis" and "the totality of the circumstances—the whole picture—must be taken into account." *United States v. Cortez*, 449 U.S. 411, 417 (1981); *see also United States v. Silva*, 957 F.2d 157, 160 (5th Cir. 1992) ("The presence or absence of reasonable suspicion must be determined in light of the totality of the circumstances confronting a police officer, including all information available to the officer at the time of the decision to stop a person.").  "Factors that ordinarily constitute innocent behavior may provide a composite picture sufficient to raise reasonable suspicion in the minds of experienced officers." *United States v. Holloway*, 962 F.2d 451, 459 (5th Cir. 1992).  Law enforcement officers who reasonably but

---

[21] Petition, ¶ 12.

mistakenly conclude that reasonable suspicion or probable cause is present are entitled to qualified immunity. *See Mendenhall v. Riser*, 213 F.3d 226, 230 (5th Cir. 2000).

In his deposition, Deputy O'Connor testified that units in the Gardere area called for assistance in response to a shooting.[22]  Although the shooting was reported on Skysail Avenue, a deputy stated over the radio that there were two suspects possibly fleeing the Helm Drive area.[23] Deputy O'Connor further testified that when he arrived at the Helm Drive area Mr. White and Mr. Kelly were already being detained.[24]  Similarly, Deputy Gehling testified in his deposition that when he arrived at the scene Mr. White and Mr. Kelly were being held at gunpoint.[25]  Once the suspects were instructed to get on the ground, Deputy Gehling handcuffed both of them and "put them in the back of units that were on the scene to detain them until we figured out what was going on."[26]  In their statement of uncontested material facts, the defendants state that Mr. White was detained "by a deputy who believed he was the suspect fleeing the shooting scene on Skysail."[27]  The plaintiffs dispute this statement as calling for a conclusion of what the deputy believed.[28]

Mr. White provided his account of the events when he and Mr. Kelly were initially detained. According to Mr. White, he attended a Mother's Day party on Helm Drive and was helping Ms. Elphage return speakers and other items from the party to her house.[29]  It was while he was returning to the house with Mr. Kelly to retrieve more supplies that he was initially detained:

> Yes, going back and get the rest of the stuff.   And [the deputy] looked at me.  Well, he passed me up.  So, I didn't pay no mind to him.  So, when I didn't pay no mind to him, I finished walking back to the other house by Ms. Diana Morgan house.  And before you know it, I saw, like, three other cop cars came.  And he walked toward me.  And I'm, like, what's going on.  And he just told me get down to the ground.

---

[22] R. Doc. 16-2, at 10.
[23] R. Doc. 16-2, at 12.
[24] R. Doc. 16-2, at 14.
[25] R. Doc. 22-2, at 14-15.
[26] R. Doc. 22-2, at 15.
[27] R. Doc. 17, at 2.
[28] R. Doc. 22-3, at 2.
[29] R. Doc. 16-5, at 18-19.

> And I'm like, what I do.  He told me – he didn't want to tell me. He just – he kind of
> kicked me in my knee, and got me to my knees, and he put me on the ground and –[30]

He then described what the deputy told him while he was being detained:

> He ain't say nothing but ask me where the gun was at.  And I said, I don't have no
> gun, I don't own no gun or none of that.  And he was, like, don't lie to me because
> they told me that they saw you with a gun, so, tell me where the gun is.  And I went, I
> don't have any gun, sir.  He, like, all right, you going to play that rough game with
> me, all right, we going to take you in.  And I'm like, that don't make no sense.[31]

Mr. White also testified that while he was detained on the ground, Mr. Kelly was "getting on his

bike" and was tackled by deputies and detained as well.[32]

Based on the factual record, the court concludes that Deputy O'Connor is entitled to qualified

immunity with regard to Mr. Whites' false detention claim.  The burden falls on the plaintiffs to

establish that Deputy O'Connor committed a constitutional violation or otherwise acted unreasonably

in committing the constitutional violation.  *See Club Retro, LLC*, 568 F.3d at 194; *Goodson*, 202

F.3d at 736.  It is undisputed that Mr. White and Mr. Kelly were in the vicinity of the area where

the deputies were seeking two potentially armed suspects, he was seen by at least one deputy moving

items (including a stereo) out of a house, and the deputy who initially detained him said that he had

been informed that Mr. White was armed.[33]  Mr. Kelly's attempt to get on his bike could have been

reasonably interpreted by the deputies to be an attempt to flee the scene.  The plaintiffs have failed to

demonstrate that there are disputed material facts in the record regarding the detention of Mr. White

establishing that the deputy (or deputies) who detained Mr. White acted without reasonable suspicion

or otherwise acted in an objectively unreasonable manner in light of the clearly established law

surrounding reasonable suspicion.

---

[30] R. Doc. 16-5, at 19.
[31] R. Doc. 16-5, at 20.
[32] R. Doc. 16-5, at 19.
[33] The court notes that the name of the deputy who initially detained Mr. White has not
been identified by the parties in their briefing and does not otherwise appear to be identified in
the record.

Furthermore, the claim fails against Deputy O'Connor on the more basic ground that there is no genuine issue of material fact regarding his lack of involvement in Mr. White's physical detention.  The plaintiffs do not dispute that Deputy O'Connor arrived after Mr. White and Mr. Kelly were first detained and his initial role in the detention involved using his canine to help "keep the crowd away from the deputies who were detaining the suspects."[34]  Having arrived on the scene to see Mr. White and another suspect detained at gunpoint, Deputy O'Connor acted with reasonable suspicion, or otherwise acted reasonably but mistakenly in determining that he had reasonable suspicion, in assisting in the detention.  He is, therefore, entitled to qualified immunity.  *See Johnson v. Deep East Texas Regional Narcotics Trafficking Task Force*, 379 F.3d 293, 305 (5th Cir. 2004) (officer who relied on information furnished by another officer as to arrestee's address and who had no reason to believe that the information was not correct or that the arrestee was likely not at the house was entitled to qualified immunity).

The court notes that the plaintiffs have not established any material facts regarding a discrepancy between the physical description of the fleeing shooting suspects and Mr. White's own physical appearance at the time of his detention.  Accordingly, the court distinguishes the facts and conclusion of *Goodson v. City of Corpus Christi*, 202 F.3d 730 (5th Cir. 2000).  In *Goodson*, the Fifth Circuit reversed summary judgment for the officer-defendants where the plaintiff had raised a genuine issue of material fact regarding his appearance and the description of the suspect on which the officer-defendants based their reasonable suspicion for detaining him.  Here, the plaintiffs have not demonstrated that there is a genuine issue of material fact regarding the appearance of Mr. White and Mr. Kelly relative to the appearance of the two shooting suspects.

---

[34] R. Doc. 22-3, at 3.

### iii.  False Arrest of Veronica Elphage

The claim of false arrest implicates the constitutional guarantees of the Fourth and Fourteenth Amendments.  *Martinez v. Klevenhagen*, 52 F.3d 1068 (5th Cir. 1995).  To establish that the deputies in their individual capacities violated Ms. Elphage's constitutional rights by arresting her, the plaintiffs must show that the deputies lacked probable cause to arrest her.  *See Haggerty v. Tex. S. Univ.*, 391 F.3d 653, 655 (5th Cir. 2004).  Probable cause exists "when the totality of the facts and circumstances within a police officer's knowledge at the moment of arrest are sufficient for a reasonable person to conclude that the suspect had committed or was committing an offense."  *Glenn v. City of Tyler,* 242 F.3d 307, 313 (5th Cir. 2001).  "If there was probable cause for any of the charges made . . . then the *arrest* was supported by probable cause, and the claim for false arrest fails."  *Wells v. Bonner*, 45 F.3d 90, 95 (5th Cir. 1995).

The parties do not dispute that soon after Ms. Elphage arrived at the scene on Helm Drive, she was placed under arrest by Deputy O'Connor and Deputy Gehling for public intimidation (La. R.S. § 14:122); resisting arrest by force (La. R.S. § 14:108.2), and simple assault (La. R.S. § 14:38).[35]  Under Louisiana law, a police officer "may, without warrant, arrest a person when: (1) The person to be arrested has committed an offense in his presence; and if the arrest is for a misdemeanor, it must be made immediately or on close pursuit. . . ."  La. C. Cr. P. Art. 213(1).

The defendants have asserted that Ms. Elphage's "arrest was made in good faith, and based on the firsthand knowledge of Deputy O'Connor, who made the arrest."[36]  In his deposition, Deputy O'Connor testified that while the two suspects were being detained, Ms. Elphage was "screaming and yelling" and did not respond to the deputies' commands to get

---

[35] R. Doc. 16-3, at 51.
[36] R. Doc. 16-1, at 19.

back.[37]  He also testified that she resisted arrest by "jerking away when Deputy Gehling went to

place handcuffs on her."[38]  The plaintiffs dispute these characterizations of Ms. Elphage's

behavior.[39]  In particular, plaintiff Carmenitha Kelson testified in her deposition that Ms.

Elphage was not yelling at the officers.[40]  Similarly, plaintiff Ernest Elphage testified in his

deposition that Ms. Elphage was not yelling, threatening, or cursing the deputies and complied in

the course of her arrest, including not jerking away when the deputies handcuffed her.[41]

It is undisputed that after the plaintiffs filed their petition, Ms. Elphage was prosecuted on

the charges of resisting an officer (La. R.S. § 14:108) and simple assault (La. R.S. § 14:38).[42]

On September 26, 2011, Ms. Elphage completed a pretrial intervention program (PTI), resulting

in a dismissal of the charges against her.[43]  The Defendants have argued that Ms. Elphage's

participation in this pretrial program constituted a conviction for purposes of *Heck v. Humphrey*,

512 U.S. 477 (1994).[44]  Based on this alleged conviction, the Defendants argue that Ms. Elphage

cannot raise a § 1983 claim for false arrest as a judgment in her favor would imply the invalidity

of her conviction.  For the following reasons, the court agrees.

In *Heck v. Humphrey*, the Supreme Court held that "in order to recover damages for

allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions

whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove

---

[37] R. Doc. 16-2, at 21-22.
[38] R. Doc. 16-2, at 27.
[39] R. Doc. 22-3, at 4.
[40] R. Doc. 16-6, at 30.
[41] R. Doc. 22-1, at 33-34.
[42] R. Doc. 9-3.
[43] Pretrial intervention programs allow criminal defendants to be put on a probationary period, the successful completion of which generally results in the dismissal of the charges brought against the criminal defendant.  Depending on the jurisdiction, it may also be referred to as pretrial diversion, diverted prosecution, deferred adjudication, or accelerated rehabilitation disposition, among other things.
[44] R. Doc. 16-1, at 19.

that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus. . . ."  *Id*. at 486-87.  In other words, the court may only entertain a § 1983 claim by a convicted plaintiff if the court determines that a ruling in the plaintiff's favor will not call into question the validity of the plaintiff's conviction (*Heck*'s favorable termination rule).  The issue, therefore, is whether Ms. Elphage's participation in, and completion of, the pretrial intervention program constituted a conviction pursuant to *Heck* and whether that criminal proceeding was terminated in her favor.

The Circuit Courts of Appeal are split on this issue.  Some have refused to apply *Heck*'s favorable termination rule where the plaintiff participates in or completes a pretrial intervention program, but is not convicted as a result of a criminal trial.  *See Vasquez Arroyo v. Starks*, 589 F.3d 1091, 1095 (10th Cir. 2009) (*Heck* did not apply because participation in pretrial diversion agreement did not constitute a conviction); *S.E. v. Grant County Bd. Of Educ.*, 544 F.3d 633, 638 (6th Cir. 2008) (same); *McClish v. Nugent*, 483 F.3d 1231 (11th Cir. 2007) (same conclusion where plaintiff successfully completed pretrial intervention program).  In contrast, the Third Circuit has held that *Heck*'s favorable termination rule applies where the plaintiff successfully completes Pennsylvania's Accelerated Rehabilitative Disposition (ADR) program.  *See Gilles v. Davis*, 427 F.3d 197, 209-12 (3rd Cir. 2005).  Similarly, the Second Circuit has held (in decisions pre-dating *Heck*) that plaintiffs were barred from raising § 1983 actions for malicious prosecution after completing pretrial intervention programs.  *See Roesch v. Otarola*, 980 F.2d 850, 852-53 (2d Cir. 1992) (Connecticut's accelerated pretrial rehabilitation program); *see also Singleton v. City of New York*, 632 F.2d 185 (2d Cir. 1980) (grant of an "adjournment in contemplation of dismissal" under New York criminal procedure law).

The Fifth Circuit has joined the Third and Second Circuits in treating pretrial intervention programs as convictions under *Heck*. The Fifth Circuit has applied *Heck*'s favorable termination rule to bar § 1983 claims for false arrest, false imprisonment, malicious prosecution, illegal search and seizure, and use of excessive force based upon the plaintiff's participation in "deferred adjudication" under Texas law. *See Deleon v. City of Corpus Christi*, 488 F.3d 649, 656 (5th Cir. 2007). The Court specifically held that "a deferred adjudication order is a conviction for the purposes of *Heck*'s favorable termination rule." *Id*. The court left open the issue, however, of whether a successfully completed deferred adjudication would also constitute a conviction, requiring the application of *Heck*'s favorable termination rule. *See id*.

Similarly, in a decision pre-dating *Heck*, the Fifth Circuit held that "a pre-trial diversion agreement does not terminate the criminal action in favor of the criminal defendant for purpose of bringing a malicious prosecution claim." *Taylor v. Gregg*, 36 F.3d 453, 456 (5th Cir. 1994); *see also Evans v. Ball*, 168 F.3d 856, 859 (5th Cir. 1999) ("The rule in this circuit . . . is that proceedings terminate in favor of the accused only when they affirmatively indicate that he is not guilty."), *abrogated on other grounds by Castellano v. Fragozo*, 352 F.3d 939 (5th Cir. 2003). In the *Taylor* decision, the Court agreed with the Second Circuit that allowing a plaintiff to proceed with a § 1983 malicious prosecution claim would chill prosecutors' willingness to enter into pretrial intervention programs or similar pretrial arrangements involving a probationary period that would ultimately result in the dismissal of charges. *Id*. at 456 (citing *Singleton*, 632 F.2d at 194). Having dismissed the plaintiffs' § 1983 claim for false arrest on another ground, the Fifth Circuit did "not reach the issue of whether a pre-trial diversion agreement bars a Section 1983 suit for false arrest." *Id*. at 457.

The *Deleon* and *Taylor* decisions are instructive, but they do not directly address whether the successful completion of a pretrial intervention program resulting in the dismissal of charges, like the one completed by Ms. Elphage, precludes a § 1983 action for false arrest.  However, that very issue recently has been decided by the U.S. District Court for the Western District of Louisiana.  In *Bates v. McKenna*, No. 11-1395, 2012 WL 3309381 (W.D. La. Aug. 13, 2012), the court held that a plaintiff who voluntarily participated in and completed a pretrial intervention program[45] after being arrested for interference with a police officer and resisting an officer was barred from raising a Section 1983 claim for false arrest against those officers.  The court concluded that the plaintiff's participation in the pretrial intervention program, which resulted in the dismissal of the plaintiff's criminal charges "after the successful completion of a probationary period," was a conviction for the purposes of *Heck*.  *Id*. at *4-5.  As a result, the court concluded it could only entertain the plaintiff's § 1983 action for unlawful arrest if a ruling on that claim would "not necessarily call into question the validity" of the plaintiff's conviction.  *Id*.

Applying *Heck*'s favorable termination rule, the court concluded that the plaintiff's § 1983 claim for false arrest was barred.  The plaintiff was charged under the Louisiana criminal statute for resisting an officer, which is defined as "the intentional interference with, opposition or resistance to, or obstruction of an individual acting in his official capacity and authorized by law to make a ***lawful arrest***, ***lawful detention***, or seizure of property or to serve any lawful process or court order when the offender knows or has reason to know that the person arresting, detaining, seizing property, or serving process is acting in his official capacity."  *Id*. at *5

---

[45] The court addressed what it called a "pretrial diversion agreement" but noted that *Heck*'s favorable termination rule "is also applicable to pretrial programs such as pretrial diversion agreements, accelerated rehabilitation disposition programs, deferred adjudication orders, and pretrial intervention programs, wherein charges are dismissed only after the criminal defendant successfully completes a probationary period."  *See Bates*, 2012 WL 3309381, at *4.

(quoting La. R.S. 14:108 (emphasis added)).  The court concluded that the plaintiff's participation in the pretrial intervention program necessarily implied that the officer made a lawful arrest and lawful detention.  *Id*.  Because success on his civil § 1983 claim for false arrest would establish that his conviction lacked any legal basis, the court concluded that the plaintiff's civil § 1983 claim was barred.  *Id*.

The relevant facts surrounding Ms. Elphage's § 1983 claim for false arrest are the same as those surrounding the plaintiff in *Bates*.  Like the plaintiff in *Bates*, Ms. Elphage was charged with resisting an officer under La. Rev. Stat. Ann. § 14:108.  She, too, entered into and completed a pretrial intervention program resulting in the dismissal of the charges brought against her.  This resulted in a conviction for the purpose of *Heck*.  *Bates*, 2012 WL 3309381, at *4.  Allowing Ms. Elphage to proceed with a Section 1983 claim for wrongful arrest would undermine her participation in, and completion of, the pretrial intervention program.  Ms. Elphage's voluntary participation in the pretrial intervention program with regard to the charge of resisting arrest necessarily implies that Deputy O'Connor conducted a lawful arrest, and therefore, had probable cause for arresting her.  *Id*. at *5 (citing La. R.S. 14:108).  Allowing Ms. Elphage to proceed with her § 1983 claims would chill prosecutors' willingness to enter into a pretrial intervention program like the one completed by Ms. Elphage.  *See Taylor*, 36 F.3d at 456.

Considering the foregoing, the court concludes that Ms. Elphage's claim for false arrest is barred under *Heck*.  Because Ms. Elphage's § 1983 false arrest claim is barred under *Heck*, the court need not address whether Deputy O'Connor is entitled to qualified immunity with regard to the claim.

### iv.  Excessive Force Claims

An excessive force claim brought under § 1983 is a constitutional claim analyzed through the Fourth Amendment's "objective reasonableness" standard for unreasonable seizures. *Graham*, 490 U.S. at 388.  To overcome the defense of qualified immunity on a claim of excessive force, "a plaintiff must show that he was seized and that he 'suffered (1) an injury that (2) resulted directly and only from the use of force that was excessive to the need and that (3) the force used was objectively unreasonable.'"  *Ballard v. Burton,* 444 F.3d 391, 402 (5th Cir. 2006) (quoting *Flores v. City of Palacios,* 381 F.3d 391, 396 (5th Cir. 2004)).  The court's determination of whether an officer's use of force was objectively reasonable "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396.  "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  *Id.*  "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.'"  *Id.*

Plaintiffs are not required to prove a "significant injury" to raise an excessive force claim under § 1983.  *See Harper v. Harris County, Tex.*, 21 F.3d 597 (5th Cir. 1994) (citing *Hudson v. McMillian*, 503 U.S. 1 (1992)).  Nevertheless, a plaintiff asserting an excessive force claim must have "suffered at least some form of injury."  *Jackson v. Culbertson*, 984 F.3d 699, 700 (5th Cir. 1993).  In the Fourth Amendment context, the force used by an officer is *de minimis* where it is

objectively reasonable under the circumstances. *Ikerd v. Blair*, 101 F.3d 430, 434 n. 9 (5th Cir. 1996). The degree of injury suffered by a plaintiff is a relevant factor for determining whether the amount of force used by the officer was *de minimis* and, therefore, insufficient to satisfy a claim for excessive force. *Ikerd*, 101 F.3d at 434 (citing *Hudson*, 503 U.S. at 7). Thus, the extent of the injuries inflicted may be considered in determining whether the officers used excessive force. *Deville v. Marcantel*, 567 F.3d 156, 168 (5th Cir. 2009) (citing *Whitley v. Albers*, 475 U.S. 312, 321 (1986)).

The court interprets the petition as alleging two separate and distinct claims for excessive force: (1) excessive force with regard to the execution of Mr. White's detention; and (2) excessive force with regard to the use of pepper spray on the gathering bystanders.[46]

### 1. Excessive Force Claim Related to Mr. White's Detention

This claim fails against Deputy O'Connor because there is no genuine issue of material fact regarding his non-involvement in pinning Mr. White to the ground or placing handcuffs on him. It is undisputed that Deputy O'Connor's sole role in the initial detention of Mr. White was holding the crowd back with his canine after arriving on the scene to find Mr. White already detained. Deputy O'Connor is entitled to qualified immunity because he had no reason to believe that the detention by the other deputies was not based on reasonable suspicion or otherwise excessive. *See Johnson*, 379 F.3d at 305.

A review of the facts indicates that even if the acts of the detaining deputies could be imputed to Deputy O'Connor, those acts did not constitute excessive force, as the amount of force used by the detaining officers was *de minimis* under the circumstances. The plaintiffs

---

[46] Ms. Elphage does not appear to have raised a claim for excessive force related to her arrest. Although the plaintiffs dispute the defendants' characterization of Ms. Elphage's behavior at the time of her arrest, they do not allege that her arrest involved any excessive force. The plaintiffs merely allege that she was "apprehended and handcuffed" and then "detained and arrested" and "brought to jail by the Sheriff's deputies." (Petition, ¶¶ 10, 13).

allege in their petition that Mr. White "was grabbed and violently thrown to the concrete ground by some of the deputies."[47]   The plaintiffs further claim that "[w]hile lying on the ground, [he] was physically restrained, battered, threatened with police dog(s), and shotgun(s) and verbally assaulted by the deputies."[48]   Mr. White testified that the deputies detaining him threatened him with canines and put the barrel of a shotgun on the side of his face.[49]   Nevertheless, the plaintiffs do not dispute that the only damages suffered by Mr. White as a result of his detention "were minor scrapes and a temporary 'ring' around his wrist from the handcuffs" and that he did not feel any effects from the use of pepper spray.[50]   Having detained Mr. White as a suspect in a shooting, the deputies "were authorized to take such steps as were reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop."  *United States v. Hensley*, 469 U.S. 221, 235 (1985).  Those steps included forcing Mr. White to the ground, handcuffing him, and placing him in a patrol vehicle until the deputies could fully assess the situation.

Considering that the deputies detaining Mr. White could have reasonably believed, under the circumstances, that Mr. White may be an armed suspect, the court will not second-guess the judgments of the detaining deputies.  As Mr. White's physical injuries were *de minimis*, the court concludes that the plaintiffs have not established that the deputies' use of force was objectively unreasonable.  *See, e.g., Club Retro*, 568 F.3d at 194; *Glenn v. City of Tyler*, 242 F.3d 307, 314 (5th Cir. 2001) (putting on handcuffs too tightly, which resulted in swelling of wrists, does not amount to excessive force).  Furthermore, the plaintiffs have not proffered any competent admissible evidence showing that Mr. White suffered any psychological injuries from being

---

[47] Petition, ¶ 6.
[48] Petition, ¶ 6.
[49] R. Doc. 16-5, at 21.
[50] R. Doc. 22-3, at 5.

detained at gunpoint that were not *de minimis*. *See Martin v. City of Alexandria Municipality Police Dep't.*, No. 03-1282, 2005 WL 4909292, at *12 (W.D. La. Sept. 16, 2005) ("There is no need . . . to proceed further in the excessive force inquiry because the [plaintiffs] have failed to demonstrate that they suffered substantial psychological injuries from the brief seizure and detention and questioning at gunpoint by the officer-Defendants.").

### 2. Excessive Force Claim Related to the Use of Pepper Spray

The court now turns to the plaintiff's allegations that the use of pepper spray to control the 15-20 people gathered at the scene constituted excessive force under the Fourth Amendment because the deputies employed excessive force to control the crowd. It is undisputed that pepper spray was not used on either Mr. White or Ms. Elphage.[51] Whereas Mr. White did not feel any effects from the pepper spray, however, Ms. Elphage felt "a minor burning sensation on her legs and chest for approximately fifteen (15) minutes." [52] The court will assume that all of the plaintiffs (with the exception of Mr. White) have raised a claim for excessive force related to the use of pepper spray. Furthermore, as the John Doe deputies have been dismissed in this action— and the plaintiffs have made no attempt to add any additional deputies as defendants—the court notes that the sole issue before it is whether the plaintiffs' Section 1983 claim for excessive force can succeed against Deputy O'Connor.

The court need not decide whether the use of pepper spray on the plaintiffs constituted a "seizure" under the Fourth Amendment because even if it did constitute a seizure,[53] the facts in

---

[51] R. Doc. 22-3, at 5.

[52] R. Doc. 22-3, at 5.

[53] Without deciding the issue, the court notes that some courts have concluded that the use of pepper spray constitutes a seizure. *See, e.g., McCracken v. Freed*, 243 F. App'x 702, 708-09 (3d Cir. 2007) (plaintiff was seized where officers threw pepper spray canisters into his house); *Logan v. City of Pullman*, 392 F. Supp. 2d 1246, 1260 (E.D. Wash. 2005) (plaintiffs intentionally sprayed with pepper spray on first floor of building were seized); *Yelverton v. Vargo*, 386 F. Supp. 2d 1224, 1228 (M.D. Ala. 2005) (plaintiff was seized when officer sprayed

the record indicate that the use of force was objectively reasonable under the circumstances. *Graham*, 490 U.S. at 397.  The deputies were searching for fleeing shooting suspects in the area and had detained two suspects.  One of the bystanders was arrested for public intimidation, resisting arrest by force, and simple assault.  Although there are factual disputes regarding whether just one deputy used pepper spray and whether the crowd was belligerent, there is no factual dispute regarding the *de minimis* nature of the injuries.  For the bulk of the plaintiffs, there is no factual statement in the record (as far as the court has been made aware) that the plaintiffs suffered any physical or psychological injury at all.  For the remainder of the plaintiffs, there is only a handful of statements regarding their alleged injuries.[54]  None of the plaintiffs submitted any medical records substantiating their alleged injuries.  Only one plaintiff, Barbara Kelson, claims to have taken her minor son in for a medical visit.  Nothing has been submitted, however, regarding the findings from that medical visit or any other evidence that she or her son suffered anything but *de minimis* injuries.

Furthermore, the plaintiffs contend that multiple deputies sprayed them with chemical control spray, not just Deputy Farrell.  The plaintiffs admit, however, that "despite depositions and written discovery, [they] have been unable to identify other deputies who deployed the spray."[55]  Although the plaintiffs deny the defendants' assertion that Deputy O'Connor did not deploy pepper spray, they do not cite to any material in the record indicating that there is a genuine dispute of material fact regarding whether Deputy O'Connor deployed pepper spray. The court need only consider "cited materials" and may ignore other materials in the record. Fed. R. Civ. P. 56(c)(3); *see also Skotak v. Tenneco Resins, Inc.,* 953 F.2d 909, 915-16 & n.7

him with pepper spray even though it did not stop him) (citing *California v. Hodari D.*, 499 U.S. 621, 626 (1991)).
[54] *See* R. Doc. 22-3, at 4-5.
[55] R. Doc. 22, at 4.

(5th Cir. 1992) ("Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment. . . ."). Although not required of it, the court has reviewed the deposition testimony submitted by both parties and has found no genuine issue of material fact regarding whether Deputy O'Connor deployed his pepper spray. He is, therefore, also entitled to summary judgment on the ground that he did not partake in the allegedly unconstitutional activity in the first place.

### B.  Section 1983 Claims Against the Defendants in Their Official Capacities

The defendants have brought claims against the Sheriff Gautreaux and Deputy O'Connor in their official capacities. A suit against a government official in his official capacity is equivalent to a suit against the government entity of which he is an agent. *Burge v. Parish of St. Tammany*, 187 F.3d 452, 466 (5th Cir. 1999); *see Monell v. Dep't of Soc. Servs. Of the City of New York*, 436 U.S. 658, 690 n.55 (1978) (official capacity suits "generally represent only another way of pleading an action against an entity of which an officer is an agent"). To determine whether a public official is liable in his official capacity, the court must look to jurisprudence discussing whether the municipality is liable under Section 1983. *Burge*, 187 F.3d at 470. Although municipalities cannot be held liable under Section 1983 under a *respondeat superior* theory,[56] they can be held liable "when execution of a government's policy or custom,

---

[56] The petition alleges that Sheriff Gautreaux is liable under the doctrine of *respondeat superior* for the acts of his deputies. Under § 1983, "supervisory officials are not liable for the actions of subordinates on any theory of vicarious liability." *Thompkins v. Belt*, 828 F.2d 298, 303 (5th Cir. 1987). "Supervisory officials may be held liable only if: (i) they affirmatively participate in acts that cause constitutional deprivation; or (ii) implement unconstitutional policies that causally result in plaintiff's injury." *Baker v. Putnal*, 75 F.3d 190, 199 (5th Cir. 1996). Here, the plaintiffs do not allege that Sheriff Gautreaux had any personal involvement with the events at issue and do not otherwise allege that he is liable in his individual capacity. The second prong of potential liability for a supervisory official is identical to the analysis for the liability of a supervisor in his official capacity. To the extent the plaintiffs raise the theory of *respondeat superior* in the context of their state law claims, that issue is dealt with below with the remainder of the plaintiffs' state law claims.

whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Monell*, 436 U.S. at 694.  "Municipal liability under 42 U.S.C. § 1983 requires proof of (1) a policymaker; (2) an official policy; and (3) a violation of constitutional rights whose "moving force" is the policy or custom."  *Davis v. Tarrant Cnty., Tex.*, 565 F.3d 214, 227 (5th Cir. 2009).

For a § 1983 claim for failure to supervise or train to survive dismissal, plaintiffs must demonstrate that "(1) the supervisor either failed to supervise or train the subordinate official; (2) a causal link exists between the failure to train or supervise and the violation of the plaintiff's rights; and (3) the failure to supervise or train amounts to deliberate indifference." *Smith v. Brenoettsy*, 158 F.3d 908, 911-12 (5th Cir. 1998).  To establish deliberate indifference, "a plaintiff usually must demonstrate a pattern of violations and that the inadequacy of the training is obvious and obviously likely to result in a constitutional violation."  *Cousin v. Small,* 325 F.3d 627, 637 (5th Cir. 2003) (internal quotation omitted); *see also Languirand v. Hayden*, 717 F.2d 220, 227-28 (5th Cir. 1983) ("[A] municipality is not liable under section 1983 for the negligence or gross negligence of its subordinate officials, including its chief of police, in failing to train the particular officer in question, in the absence of evidence at least of a pattern of similar incidents in which citizens were injured or endangered by intentional or negligent police misconduct and/or that serious incompetence or misbehavior was general or widespread throughout the police force.").  "Where a plaintiff fails to establish deliberate indifference, the court need not address the other two prongs of supervisor liability."  *Goodman v. Harris Cnty.*, 571 F.3d 388, 395 (5th Cir. 2009).  "[F]or liability to attach based on an 'inadequate training' claim, a plaintiff must allege with specificity how a particular training program is defective." *Roberts v. City of Shreveport*, 397 F.3d 287, 293 (5th Cir. 2005).

The claims against Deputy O'Connor in his official capacity must fail because he is not a policymaker for East Baton Rouge Parish. *See Club Retro, L.L.C. v. Hilton*, No. 07-193, 2008 WL 1901723, at *7 (W.D. La. Apr. 4, 2008), *rev'd in part on other grounds*, 568 F.3d 181 (5th Cir. 2009). Sheriff Gautreaux, however, is considered a "final policymaker" under Louisiana law and may be sued in his official capacity. *See Craig v. St. Martin Parish Sheriff*, 861 F. Supp. 1290, 1301 (W.D. La. 1994); La. Const. art. 5, § 27 ("[The sheriff] shall be the chief law enforcement officer in the parish.").

The plaintiffs' suit against Sheriff Gautreaux in his official capacity is really a suit against the East Baton Rouge Sheriff's Office.[57] The plaintiffs allege that at the time of the underlying events, Sheriff Gautreaux, and therefore the East Baton Rouge Sheriff's Office, had "a custom, policy, practice, and procedure of negligently and inadequately hiring, training, testing, supervising and retaining deputies" and was "negligent in their failure to adequately train, supervise and discipline their deputies."[58] Furthermore, the plaintiffs allege that Sheriff Gautreaux, and therefore the East Baton Rouge Sheriff's Office, "[c]ondoned, ratified, approved and/or otherwise acquiesced in" the alleged constitutional violations and "[c]onspired to and did in fact cover up facts and circumstances" regarding the use of pepper spray on the plaintiffs.[59] Finally, the plaintiffs allege that Sheriff Gautreaux, and therefore the East Baton Rouge Sheriff's Office, "[h]ad notice of a pattern of unconstitutional acts committed by subordinates, demonstrated deliberate indifference and failed to take remedial action."[60]

The plaintiffs' conclusory allegations against Sheriff Gautreaux in his official capacity cannot survive the defendants' motion for summary judgment. In response to the defendants'

---

[57] The East Baton Rouge Sheriff's Office has not been expressly named a defendant.
[58] Petition, ¶ 20(a)-(b).
[59] Petition, ¶ 20(c)-(g).
[60] Petition, ¶ 20(j).

Statement of Uncontested Material Facts—which focused on the events surrounding the detention of Mr. White, the arrest of Ms. Elphage, and the use of pepper spray on the gathering crowd—the plaintiffs respond with a single statement of contested material facts:

> Plaintiff Veronica Elphage, captured the events made [sic] the basis of this litigation on film. The camera's memory card was in the camera when Deputy O'Connor had it in his possession. The memory card was missing when it was return to them.[61]

The truth of this assertion, in the absence of further assertions premised on the factual record that the East Baton Rouge Sheriff's Office engaged in a "policy or custom," is insufficient to establish municipal liability under *Monell*. Even if the allegedly missing memory card contained relevant images regarding the events, those images involved a single event and would not establish that the East Baton Rouge Sheriff's Office had an unconstitutional policy or custom in place. *Forgan v. Howard Cnty., Tex.*, 494 F.3d 518, 522 (5th Cir. 2007) ("Proof of a single incident generally will not support a finding of inadequate training as a matter of custom or policy.").

Despite the opportunity to conduct discovery for approximately two years, the plaintiffs do not raise any genuine issue of material fact regarding their claims based on failure to

---

[61] R. Doc. 22-3, at 6. The majority of the plaintiffs' opposition to the defendants' motion for summary judgment rests on the allegation in the petition that Ms. Elphage recorded the incident on a digital camera, her camera was taken when she was arrested, and the camera was returned without the memory card. *See* Petition, ¶¶ 9, 10, 15. The plaintiffs' allegations with regard to the existence of this camera footage, in and of itself, are insufficient to defeat summary judgment. Although the plaintiffs cite deposition testimony stating that the Ms. Elphage was filming the incident on a camera and that camera was returned to her without the memory card (*see* R. Doc. 22, at 6-7), those facts, even if taken as true, do not create a genuine issue of material fact. In essence, the plaintiffs ask the court to speculate that the contents of the memory card, if available, would supply the plaintiffs with genuine issues of material fact needed to defeat summary judgment. Such a finding would ignore the Supreme Court's mandate that the plaintiff must demonstrate that there is more than "some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. The court will only consider "affirmative evidence" submitted by the plaintiffs from which a jury might return a verdict in his favor." *Anderson*, 477 U.S. at 257.

supervise or train.  In particular, the plaintiffs did not raise a genuine issue of material fact with regard to the alleged "deliberate indifference" of Sheriff Gautreaux in his official capacity.  The plaintiffs' conclusory statements in their petition are insufficient to raise a genuine issue of material fact.  *See Forgan*, 494 F.3d at523.  The plaintiffs raise no disputes of material fact, and the court can find none in the record before it, regarding the policies or customs of the East Baton Rouge Sheriff's Office with regard to how detentions and arrests are to be conducted, or with regard to the use of pepper spray as a method for crowd dispersal.  For the foregoing reasons, summary judgment must be granted to Sheriff Gautreaux in his official capacity.

### C.  Punitive Damages under Section 1983.

Plaintiffs' petition requests punitive damages, presumably under § 1983.  Punitive damages may be awarded only when the defendant's conduct "is 'motivated by evil intent' or demonstrates 'reckless or callous indifference' to a person's constitutional rights."  *Williams v. Kaufman County*, 352 F.3d 994, 1015 (5th Cir. 2003) (citation omitted).  As the court has dismissed all § 1983 claims, the issue of whether the plaintiffs are entitled to punitive damages under §1983 is moot.

### III.    Claims brought under 42 U.S.C. § 1985 and 42 U.S.C. § 1986

The plaintiffs allege claims under 42 U.S.C. § 1985 and 42 U.S.C. § 1986 as additional theories of recovery.[62]  The petition fails to identify the specific section under § 1985 but merely raise allegations of "conspiracy with regard to both Deputy O'Connor[63] and Sheriff Gautreaux."[64]  Although the defendants appear to move for summary judgment on all of the plaintiffs' claims, they have raised no arguments with regard to the plaintiffs' causes of action brought under 42 U.S.C. § 1985 and 42 U.S.C. § 1986.  In the absence of any briefing regarding

---

[62] Petition, ¶ 17.
[63] Petition, ¶ 19(d) and (i).
[64] Petition, ¶ 20(e).

why the Defendants are entitled to summary judgment on those claims, the court will not grant summary judgment on those claims.[65]

## IV.    Plaintiffs' State Law Claims

As with the federal claims, the generalized allegations of the petition, and absence of counts, make it difficult for the court to determine the exact state law claims raised by the plaintiffs and which plaintiffs are raising those discreet violations.  Having reviewed the pleadings and other submissions by the parties, the court concludes that the plaintiffs have raised state law claims for false arrest, false imprisonment, assault, battery, negligence, defamation, and intentional infliction of emotional distress against both Deputy O'Connor.  The plaintiffs have also alleged that Sheriff Gautreaux is vicariously liable under these claims.

### A.  False Arrest and Imprisonment

At most, the plaintiffs have raised claims for false arrest and imprisonment with regard to the arrest of Ms. Elphage and the detention of Mr. White.  Under Louisiana law, "[f]alse arrest and imprisonment occur when one arrests and restrains another against his will without a warrant or other statutory authority.  Simply stated, it is restraint without color of legal authority."  *Kyle v. City of New Orleans*, 353 So.2d 969, 971 (La. 1977).   "[I]f police officers act pursuant to statutory authority in arresting and incarcerating a citizen, they are not liable for damages for false arrest and imprisonment." *Id.*  Louisiana Code of Criminal Procedure article 213(1) provides that a law enforcement officer may arrest a person without a warrant when the person to be arrested "has committed an offense in his presence" or when that officer has "reason to believe that the person to be arrested has committed an offense."  Louisiana Code of Criminal

---

[65] The Court notes that there may be an issue as to whether the plaintiffs have sufficiently alleged a conspiracy under 42 U.S.C. § 1985.  Based on the facts before the Court, it appears that only 1985(3) would apply.  This requires that the conspiracy must be "for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws. . .".  There has not been an allegation or an assertion of such a racial or otherwise class-based discriminatory animus.  *See Bryant v. Military Dep't of Miss.*, 597 F.3d 678, 687 (5th Cir. 2010).

Procedure article 215.1 provides, in pertinent part, that "[a] law enforcement officer may stop a person in a public place whom he reasonably suspects is committing, has committed, or is about to commit an offense" and if in making such a stop the officer "reasonably suspects that he is in danger, he may frisk the outer clothing of such person for a dangerous weapon."

As discussed above, Mr. White was detained in accordance with the "reasonable suspicion" standard of the Fourth Amendment as described in *Terry v. Ohio*, 392 U.S. 1 (1968). The Louisiana Supreme Court has held that a "valid investigatory stop" that falls short of an arrest precludes liability for false arrest under Louisiana law. *Harrison v. State Through Dept. of Pub. Safety and Corr.*, 721 So.2d 458, 462-63 (La. 1998); *see also O'Dwyer v. Nelson*, 310 F. App'x 741, 745 n.4 (5th Cir. 2009) (citing *Harrison* for the proposition that "Fourth Amendment principles underpin Louisiana law relating to false arrests" and discussing federal and state law claims for false arrest in conjunction). The court finds that Mr. White's false arrest claim under Louisiana law must be dismissed because the detaining deputies acted with reasonable suspicion. Furthermore, the claim must be dismissed with regard to Deputy O'Connor for the additional reason that had no involvement in Mr. White's physical detention in the first place.

Ms. Elphage's false arrest and imprisonment claim must be dismissed as well. Ms. Elphage has not raised any argument regarding the applicability of *Heck*'s favorable termination rule to her state law claims. The court finds that she has "waived any argument that [her] state-law claims should be addressed apart from *Heck*." *Thomas v. Louisiana, Dep't of Soc. Servs.*, 406 F. App'x 890, 898 (5th Cir. 2010) (citing *DeLeon*, 488 F.3d at 652 n.3). As a successful ruling on Ms. Elphage's state law claims for false arrest and imprisonment would undermine her conviction for resisting an officer (La. R.S. § 14:108), her claims are barred by *Heck*. *Id.*; *see also Nelson v. Nordyke*, 2009 WL 648889 (N.D. Tex. Mar. 10, 2009) ("Plaintiff's civil rights

claims of false arrest and false detention and the corresponding pendant state law claims because those claims are *Heck*-barred, as well, and they should be dismissed until *Heck* conditions are met.").

### B.  Assault and Battery

Under Louisiana law, the torts of assault and battery, when raised against a law enforcement officer acting in the course of employment, require a showing that the law enforcement officer acted with unreasonable or excessive force.  *Gerard v. Parish of Jefferson,* 424 So.2d 440, 444 (La. Ct. App. 1982) (*citing Kyle*, 353 So.2d at 972); *see also Taylor v. United States*, 1991 WL 280066 (E.D. La. Dec. 19, 1991) ("Under Louisiana law, in the absence of the use of excessive force, a law enforcement officer cannot be held liable for assault and battery if the assault and battery occurred during a lawful arrest.").  "Whether the force used is reasonable depends upon the totality of the facts and circumstances in each case," and factors to consider are: (1) the known character of the arrestee, (2) the risks and dangers faced by the officers, (3) the nature of the offense involved, (4) the chance of the arrestee's escape if the particular means are not employed, (5) the existence of alternative methods of arrest, (6) the physical size, strength, and weaponry of the officers compared to the arrestee, and (7) the exigencies of the moment."  *Kyle*, 353 So.2d at 972.

The Fifth Circuit has stated that "Louisiana's excessive force tort mirrors its federal constitutional counterpart" and that the *Kyle* factors for excessive force are "sufficiently similar" to the *Graham* factors for excessive force.  *See Deville v. Marcantel*, 567 F.3d 156, 172-73 (5th Cir. 2009).  The court concludes that its foregoing analysis of the *Graham* factors with regard to the plaintiffs' Section 1983 excessive force claims in both the context of Mr. White's detention

and the use of pepper spray applies equally to their state law excessive force claims. *Id.* Accordingly, the court dismissed the plaintiffs' claims for assault and battery.

### C.  Negligence

The plaintiffs' negligence claims are subject to Louisiana's "duty/risk analysis, which entails five separate elements: (1) whether the defendant had a duty to conform his conduct to a specific standard (the duty element); 2) whether the defendant's conduct failed to conform to the appropriate standard (the breach element); (3) whether the defendant's substandard conduct was a cause-in-fact of the plaintiff's injures (the cause-in-fact element); (4) whether the defendant's substandard conduct was a legal cause of the plaintiff's injuries (the scope of liability or scope of protection element); and (5) whether the plaintiff was damaged (the damages element)." *Hanks v. Entergy Corp.,* 944 So.2d 564, 579 (La. 2006).  A police officer has a duty to act reasonably under the totality of the circumstances. *Mathieu v. Imperial Toy Corp.,* 646 So.2d 318, 322-23 (La. 1994).

As discussed in length above, there are no genuine issues of material fact regarding whether the deputies who detained Mr. White or used pepper spray on the remaining plaintiffs acted reasonably under the circumstances.  Furthermore, as also discussed above, the plaintiffs have waived any argument that the *Heck* favorable termination rule applies to their negligence claim.  *See Thomas*, 406 F. App'x at 898.  Because a finding that Deputy O'Connor was negligent in arresting Ms. Elphage would undermine the probable cause element of her arrest, the court finds that her negligence claim is barred by *Heck*.   Accordingly, the plaintiffs' negligence claims must be dismissed.

**D.  Intentional Infliction of Emotional Distress**

In order to recover for intentional infliction of emotional distress, the plaintiffs have the burden of proving: (1) that the conduct of the defendants was extreme and outrageous; (2) that the emotional distress suffered by the plaintiffs was severe; and (3) that the defendants desired to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result from their conduct.  *White v. Monsanto Co.*, 585 So.2d 1205, 1209-10 (La. 1991); *Deus v. Allstate Insurance Co*., 15 F.3d 506, 514 (5th Cir. 1994).  The conduct complained of must be so outrageous in character and so extreme in degree that it goes beyond all possible bounds of decency and is regarded as utterly intolerable in a civilized community. *Id*.  Liability arises only where the mental suffering or anguish is extreme, and the distress suffered must be such that no reasonable person could be expected to endure it.  *White*, 585 So.2d at 1210.

In resolving the plaintiffs' claims for intentional infliction of emotional distress, the court must review the evidence and the record taken as a whole in the light must favorable to the plaintiffs and draw all reasonable inferences in the plaintiffs' favor.  Even assuming that the first and third elements can be established, the plaintiffs have produced no relevant evidence establishing a genuine issue of material fact with regard to their alleged severe emotional distress.  As discussed above in the context of the plaintiffs' § 1983 excessive force claims, the physical injuries sustained by the plaintiffs were *de minimis*.  None of the plaintiffs submitted any medical records substantiating any psychological injuries.  The plaintiffs did not submit any evidence, or even argue, that they sought mental health treatment or counseling, had nightmares or lost an excessive amount of sleep regarding the events, or any other information suggesting that they suffered from "severe" emotional distress.  Again, only plaintiff Kelson claimed to have

taken her minor son in for a medical visit, but nothing has been submitted suggesting that the visit involved mental health issues.

For the foregoing reasons, the court finds that there is no genuine issue of material fact regarding whether the plaintiffs have suffered from "severe" emotional distress.  Accordingly, their state law claims for intentional infliction of emotional distress must be dismissed.

### E.  Defamation

The plaintiffs must satisfy three elements to prevail on their defamation claims: "(1) a false and defamatory statement concerning another; (2) an unprivileged publication to a third party; (3) fault (negligence or greater) on the part of the publisher; and (4) resulting injury. *Trentecosta v. Beck,* 703 So.2d 553 (La.1997).  "The fault requirement is often set forth in the jurisprudence as malice, actual or implied."  *Costello v. Hardy*, 864 So. 2d 129, 139 (La. 2004).

In their motion, the defendants asserted that the plaintiffs "have made no specific allegations of the purportedly defamatory statement."[66]  In response to this assertion, the plaintiffs have failed to raise a genuine issue of material fact regarding the alleged false and defamatory statement, that such alleged statement was published to a third party, made with malice, or resulted in any cognizable injury.  As such, the plaintiffs' defamation claim must fail as a matter of law.  *See Doucet v. City of Bunkie*, 2006 WL 3256496 (W.D. La. Nov. 9, 2006) (granting summary judgment on "defamation per se claim" where the plaintiff "failed to come forward with any specific facts which establish a genuine issue for trial, with respect to her defamation claim").

---

[66] Rec. Doc. 16-1, at 22.

### F.  Respondeat Superior

Plaintiffs claim that Sheriff Gautreaux in his official capacity (i.e., the East Baton Rouge Parish Sheriff's Office) is vicariously liable for the alleged misconduct of the deputies involved in the incidents forming the basis of this lawsuit.  Unlike with regard to § 1983 actions, "[m]unicipalities do not enjoy special protection from vicarious liability under Louisiana law and are subject to *respondeat superior* like every other employer.  *Deville*, 567 F.3d 156, 173-74 (5th Cir. 2009) (citing *Brasseaux v. Town of Mamou*, 752 So.2d 815, 820 (La. 2000) ("Although an employment relationship may in fact exist, the employer will not be liable for the substandard conduct of the employee unless the latter can be fairly said to be within the course and scope of employment with the former.").

The foregoing analysis with regard to the plaintiffs' state law claims establishes that the deputies involved in the incidents forming the basis of this lawsuit did not commit any tortious conduct for which the East Baton Rouge Sheriff's Office can be held vicariously liable under the doctrine of *respondeat superior*.  Accordingly, the state law claims raised against Sheriff Gautreaux in his official capacity under the theory of *respondeat superior* must be dismissed as well.

### <u>RECOMMENDATION</u>

Accordingly, **IT IS RECOMMENDED** that the Motion for Summary Judgment (R. Doc. 16) should be **GRANTED in part and DENIED in part.**

The plaintiffs' federal claims under 42 U.S.C. § 1983, and the Fourth, Fifth, and Fourteenth Amendments of the United States Constitution and the plaintiffs' state law claims for assault, battery, negligence, false arrest, false imprisonment, defamation, and intentional infliction of emotional distress should be **DISMISSED with prejudice.**

36

Summary judgment with regard to the plaintiffs' federal claims under 42 U.S.C. § 1985 and 42 U.S.C. § 1986 should be **DENIED** as insufficiently briefed.

Signed in Baton Rouge, Louisiana, on August 9, 2013.

**RICHARD L. BOURGEOIS, JR.**
**UNITED STATES MAGISTRATE JUDGE**